Commercial Finance Company, et al. [1] v. Commissioner. Commercial Finance Co. v. Commissioner
Docket Nos. 2344-64, 4951-64, 3987-65, 3988-65.
United States Tax Court
T.C. Memo 1968-229; 1968 Tax Ct. Memo LEXIS 72; 27 T.C.M. (CCH) 1114; T.C.M. (RIA) 68229; October 3, 1968. Filed *72 Commercial Finance Company, a Colorado corporation, was dissolved in 1962, and all of its assets were distributed to its shareholders. Included in corporate assets were substantial debts due from the Estate of Gertrude Cullen, Deceased, the majority stockholder, some of which were secured by deeds of trust on business properties which were left to two relatives who were also entitled to her Commercial stock under her will. Commercial, an accrual basis taxpayer, had regularly accrued interest on the deed of trust notes on its books and reported them for income tax purposes. The Estate, a cash basis taxpayer, had deducted the interest in its fiduciary income tax returns. The estate administration was concluded simultaneously with the dissolution of Commercial, the executor of the estate being also the president of and only other shareholder in Commercial. The two beneficial shareholders, who were also the only two residuary legatees and devisees under Gertrude's will, agreed on a division of the assets of the estate. The decedent's notes were marked paid and the deeds of trust released so that the real estate in the residuary estate was divided free of encumbrances. The Commissioner *73 determined deficiencies in income taxes against Commercial for the years 1956 through 1961 and for the period January 1, 1962 to August 31, 1962, the date of dissolution, under secs. 541 and 542(a), I.R.C. 1954, as a personal holding company, and asserted liability against Neil P. Cullen as transferee of Commercial's assets. He also asserted liability against Neil R. Cullen and Marian Warfield Hefferlin as transferees of the Estate of Gertrude Cullen, Deceased. Held: Commercial Finance Company was an accrual basis taxpayer with respect to its income and it properly accrued and reported the annual interest due on the Gertrude Cullen notes held by it. Held, further: Commercial Finance Company is subject to tax as a personal holding company. Held, further: Commercial Finance Company is not entitled to a dividends paid deduction in the computation of its personal holding company taxes for the years 1956 through 1961. Held, further: Assessment against Commercial Finance Company of its deficiencies for the years 1956, 1957, 1958 and 1959 is not barred by the applicable statutory 1115 period of limitations. Held, further: Petitioner Neil R. Cullen is liable *74 under sec. 6901, I.R.C. 1954, for the tax deficiencies of Commercial Finance Company. He is Commercial's transferee under sec. 6901 and Colorado law. Held, further: Assessment of liability against petitioner Neil R. Cullen as Commercial's transferee is not barred by the applicable statutory period of limitations. Held, further: Petitioners Neil R. Cullen and Marian W. Hefferlin are liable under sec. 6901 and Colorado law as transferees of the Estate of Gertrude Cullen for the estate's income tax deficiencies. The estate is also subject to a negligence penalty as determined by respondent. Held, further: Assessment of transferee liabilities for the deficiencies of the Estate of Gertrude Cullen is not barred by the Applicable statutory period of limitations. Gene F. Reardon, 2150 First Nat'l Bank Bldg., Denver, Colo., for the petitioners. Richard J. Shipley, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: These four consolidated cases involve deficiencies in income taxes, an addition to tax under section 6653(a), Internal Revenue Code of 1954, and related transferee liabilities for each primary deficiency or addition to tax determined by respondent. Altogether, respondent has determined the following deficiencies in income tax, additions and asserted transferee liabilities: *10 Commercial Finance Company, Docket No. 2344-64 *10 Neil R. Cullen, Transferee, Docket No. 4951-64
Taxable Year Ended
Deficiency
December 31, 1956
$3,490.38
December 31, 1957
3,396.84
December 31, 1958
776.93
December 31, 1959
3,588.03
December 31, 1960
3,696.15
December 31, 1961
1,627.25
January 1, 1962 to August 31, 1962
170.18
*79 Marian Warfield Hefferlin, Transferee, Docket No. 3987-65, (Estate of Gertrude Cullen, Transferor) Neil R. Cullen, Transferee, Docket No. 3988-65 (Estate of Gertrude Cullen, Transferor) Taxable Year Ended
Deficiency
Sec 6653(a) Penalty
December 31, 1959
$4,063.91
December 31, 1960
3,680.71
$184.03
December 31, 1961
4,735.26
Certain issues were settled by the parties prior to trial and by written stipulation, and the area of agreement included concessions by the respective petitioners of portions of the above-stated deficiencies. These concessions and agreements in no way affect our disposition of the issues which remained for decision at the time of trial. However, on brief petitioners concede also that the notice of deficiency to Commercial Finance Company dated March 10, 1964, was properly mailed in accordance with the provisions of the Internal Revenue Code and that this Court has jurisdiction over the years involved. The remaining issues for decision are as follows: I. Whether Commercial Finance Company is subject to tax as a personal holding company. II. Whether Commercial Finance Company was an accrual basis taxpayer with respect to *80 its income, and whether it properly accrued and reported the annual interest due on the Gertrude Cullen notes held by it. III. If Commercial was a personal holding company, whether a dividends paid deduction is allowable in the computation of its personal holding company taxes for the years 1956-1961, inclusive. IV. Whether assessment against Commercial Finance Company of the deficiencies for the years 1956, 1957, 1958, and 1959 is barred by the statutory period of limitations. V. Whether petitioner Neil R. Cullen is liable as a transferee of Commercial Finance Company for its tax deficiencies. VI. Whether assessment of liability against Neil R. Cullen as transferee of Commercial Finance Company is barred by a statutory period of limitations. VII. Whether petitioners Neil R. Cullen and Marian Warfield Hefferlin are liable as transferees of the Estate of Gertrude Cullen, and whether the estate is subject to a negligence penalty. VIII. Whether the proposed transferee liabilities for the deficiencies of the Estate of Gertrude Cullen are barred by the statutory period of limitations. Findings of Fact Some of the facts have been stipulated, are found accordingly *81 and are incorporated herein by this reference. Commercial Finance Company, petitioner in Docket No. 2344-64, is a dissolved 1116 Colorado corporation, the formal date of its dissolution being August 31, 1962. Its Federal income tax returns for the years 1956 through 1961 and for the taxable period ending August 31, 1962, were filed with the district director of internal revenue at Denver, Colorado. Neil R. Cullen, the petitioner in Docket No. 4951-64, is an individual residing in Denver, Colorado. Prior to the dissolution of Commercial Finance Company, Neil had been an officer and a major stockholder of that corporation. He was either vice president or president of the corporation in all of the years before us. Income tax liability is asserted against Neil in Docket No. 4951-64 only in his capacity as an alleged transferee of assets of Commercial Finance Company. Prior to the dissolution of Commercial Finance Company, Gertrude Cullen, the sister-in-law of Neil Cullen, had also been a major stockholder in Commercial. In 1955 two notes to Commercial were executed in her name secured by deeds of trust on Denver business properties which she owned. In 1958 Gertrude Cullen died, *82 and her estate, of which Neil Cullen was the executor, deducted from gross income for the years 1959 through 1961 and for the short period January 1, 1962-August 31, 1962, the interest due annually to Commercial on the notes running from Gertrude to Commercial. After the Estate of Gertrude Cullen was closed, the respondent disallowed the interest deductions and asserted other income tax deficiencies against the Estate of Gertrude Cullen, Deceased. Neil R. Cullen, the petitioner in Docket No. 4951-64, supra, (as alleged transferee of Commercial Finance Company) is also the petitioner in Docket No. 3988-65, as alleged transferee of assets of the Estate of Gertrude Cullen, Deceased. Marian Warfield Hefferlin, grandniece of Gertrude Cullen, is an individual residing in Palm Springs, California. She is the petitioner in Docket No. 3987-65, also as an alleged transferee of assets of the Estate of Gertrude Cullen, Deceased. Fiduciary income tax returns for the years 1959, 1960, 1961 and the taxable period ending August 31, 1962, were executed by Neil as executor and filed by the estate with the district director of internal revenue at Denver, Colorado. To summarize, Neil Cullen is before *83 this Court in two docket numbers as alleged transferee of the assets of Commercial Finance Company and as alleged transferee of the Estate of Gertrude Cullen, Deceased. Marian Warfield Hefferlin is before us only as an alleged transferee of the Estate of Gertrude Cullen, Deceased. The primary tax liability of Commercial Finance Company (as transferor) is in dispute and Commercial, a dissolved corporation, is itself a petitioner in its own name. The income tax liability of the Estate of Gertrude Cullen, Deceased (as transferor) is not basically in dispute and the estate is not a petitioner. Prior to 1941, Commercial Finance Company was a corporation engaged in the business of financing the sale of automobiles and other goods usually sold through an installment arrangement. Organized in 1913, Commercial pursued its financing business actively in the years prior to World War II. During these years Commercial was "run" by Frank C. Cullen, its president and a major stockholder. The remainder of Commercial's outstanding stock was closely held by members of the Cullen family. The Cullen family, or some of them, were also active in the retail sale of automobiles through interests in Cullen-Thompson *84 Motor Company, a partnership. Commercial Finance Company had prospered since its inception, the net taxable income of the corporation from its organization on August 6, 1913, to dissolution on August 31, 1962, amounting to $404,211.04. The bulk of the corporation's earnings occurred before World War II. With the advent of the Second World War and the curtailment of civilian automobile production, there was hardly any market for the financing of automobile loans and Commercial became an inactive corporation. Frank C. Cullen left Denver in 1945 for reasons of health, never returned, and died in New York in 1947. After Frank's departure in 1945, the affairs, such as they were, of Commercial came into the charge of petitioner Neil R. Cullen, Frank's brother. Neil too, was a substantial stockholder of Commercial and its books and records were in his care. Commercial had virtually no new business thereafter. Apart from three notes running from Frank to the corporation which had been made after the corporation became inactive and before Frank's departure from Denver, Commercial had hardly any assets worthy of mention. These notes from Frank to the corporation had been executed in 1944 *85 1117 and 1945 to renew earlier loans from Commercial to Frank and were later replaced by notes running from his widow to the corporation. There were in addition a few notes which were deemed uncollectible and two or three collectible notes with a value of approximately $2,000. With the exception of the general ledger, Commercial's corporate records have been lost or destroyed by flood during the intervening years, and the primary evidence as to the level of Commercial's business activity during World War II and the postwar period is petitioner Neil Cullen's oral testimony and the corporate income tax returns. Neil's testimony as to Commercial's business activity after the beginning of the war is not disputed, and is substaniated by the documentary evidence of record. After Neil took over the operation of Commercial, the corporation remained in a semi-dormant state and was used primarily by Neil as a convenient bank account or personal pocketbook for Frank and Gertrude Cullen. Gertrude was the sole beneficiary under Frank's will and inherited his stock in Commercial, valuable rental property in the 900 and 1000 blocks of Broadway in Denver, as well as other realty and personalty *86 of substantial value. Gertrude had left Denver in 1945 with Frank, and after his death she went to Europe and remained there until her own death on December 23, 1958. During the whole period of Gertrude's absence and until her death, Neil, who was also the administrator c. t. a. of Frank Cullen's estate, managed Gertrude's Denver affairs for her in their entirety. He collected the rents from her real estate and the dividends and interest from her intangible personal property; he attended to the management of her properties and the Cullen-Thompson partnership, in which she held a substantial interest, paid her bills and other obligations, gave gifts and donations for her, endorsed and negotiated her checks, sent her money for living expenses, prepared, executed and filed her income tax returns, and upon her death, pursuant to her own will he became her executor. He treated her money and her property in every way as if it were his own, keeping a ledger account to reflect the actions taken. He deposited large sums of money to Gertrude's own checking accounts thus keeping her supplied with ample cash funds. At the time of her death, her own checking account in the First National City Bank *87 of New York had a balance of $46,241.27 on deposit. Neil had absolute and complete authority to act for Gertrude which he exercised freely and without restraint over the years with Gertrude's assent and approval. During this period no accounting was requested by Gertrude and none was furnished to her. The various items of income and amounts of principal which petitioner Neil Cullen collected for Frank and later for Gertrude, his sister-in-law, were deposited to a general checking account in the name of Commercial Finance Company at the First National Bank in Denver. The corporation did not report these receipts as its own income. The income Neil collected for Gertrude through Commercial was clearly treated as Gertrude's for tax purposes. The only cash which entered Commercial's bank account during these post-war years consisted of Frank's and Gertrude's personal funds collected from the abovementioned sources, as well as small amounts representing funds belonging to Commercial and the personal funds of other individuals and family members whose affairs Neil was managing. Commercial had another checking account in the North Denver Bank from 1952 through 1963; this was a relatively *88 inactive account and apparently used for funds other than Gertrude's. As stated previously, Neil actually endorsed the various checks, which were the property of his sister-in-law, and deposited them to Commercial's own First National bank account. How they were endorsed does not appear of record, but apparently Neil had no compunction about signing Gertrude's name to whatever instrument came along. No one apparently ever raised questions about this. At the end of December 1958, the month of Gertrude's death, the Commercial Finance bank account at the First National reflected a balance of some $23,000; when Gertrude's estate was closed in August of 1962, there was more than $56,000 on deposit in this account. The North Denver Bank account had a balance of $6,370.58 when Gertrude died and $1,370.58 throughout all of 1962. Although Frank's and Gertrude's personal funds were not segregated in the Commercial checking account, segregated accounts were maintained for them and after their deaths, for their estates on the only books Neil maintained to reflect Commercial's own affairs as well as the affairs 1118 of the other pending accounts in Neil's charge. Any other books, checkbooks, *89 ledgers or journals that might have previously existed were lost, mislaid or destroyed by flood; at least they were not produced at trial. All moneys handled by Neil and received for Gertrude or the others was credited to the accounts in the general ledger book, and all expenses, withdrawals and interest charges were debited to it. In Neil's words, "It [the Commercial account] was a joint account for all incoming money was put in the Commercial Finance." It was accounted for through the open accounts maintained on the books of Commercial. Throughout the years, Gertrude's account reflected a substantial debit balance. The debit balance rose from $11,430 in 1947, the year of Frank Cullen's death, to more than $118,000 at Gertrude's own death. After Gertrude's death, her estate deducted for estate tax purposes the sum of $118,365.63 as the debt owing to Commercial Finance Company on her open account with that corporation. As will be later explained almost the entire debit balance was due to unpaid interest on loans to the Cullens. It is clear that Commercial did not treat the disbursements made to Gertrude or on her behalf as dividends. On the ledger book of the corporation, they *90 are clearly treated as loans or advances. At the time of the corporation's dissolution in August of 1962, its final financial statement showed these amounts as accounts receivable from Gertrude's estate. Consistently, the estate, in deducting the total open account debt, treated the disbursements made to Gertrude or for her benefit as loans or advances, and the fiduciary income tax returns deducted interest allegedly paid on the loans and reported no dividends from Commercial. No formal dividends were ever declared in the history of the company. None are reflected on the books or tax returns of the corporation, such as we have of them. The only corporate distributions as such were made as of August 31, 1962, when the corporation was dissolved and liquidated. As indicated above, after Frank Cullen's death in 1947, Commercial, managed and operated by Neil Cullen, functioned primarily as a repository of funds and as a collecting and disbursing agent for Frank's estate and for his widow, Gertrude, and her estate. The parties have stipulated that during the period from January 1, 1956, until the date of Commercial's liquidation on August 31, 1962, the stockholders of the corporation *91 and their respective holdings were as reflected in the following table. However, other evidence of record indicates that until some time in 1962 the socalled escrow holders were neither in truth nor in fact preferred stockholders of the corporation but were merely treated as such upon dissolution on August 31, 1962, so as to share in liquidating distributions made as of that date. The stipulation as to the stockholders during the period indicated is as follows: Preferred Stock
Stockholders
Shares
Gertrude Cullen or her estate
464
Neil R. Cullen
536
Escrow for:
Marian Hefferlin
100
W. J. Cullen
100
R. E. Cullen
100
Rose Ludlow
100
Harriet Othmar 100
Total
1,500
Common Stock Gertrude Cullen or her estate
3,213.5
Neil R. Cullen 1,786.5
Total
5,000
During these same years, the period in issue with respect to Commercial, the corporation reported interest income on its Federal income tax returns as follows: Year
Interest Income
1956
$7,774.58
1957
7,506.42
1958
8,064.34
1959
7,716.43
1960
8,237.87
1961
7,831.37
Period ending 8/31/62 (dissolution)
5,020.00
With the exception of the taxable year 1961 and the *92 final taxable period ending August 31, 1962, the above-stated amounts of interest income were the only income items reported on the corporate returns for the respective taxable periods. For 1961 the corporation reported an additional amount of $1,694.30, attributable to bad debts collected; for 1962 the corporation reported "other income" amounting to $4. Accordingly, in each of the above-listed taxable periods, interest income constituted more than 80 percent of the corporation's taxable income. Further, this interest income was attributable almost entirely to interest accrued on two large notes which were owing from Gertrude Cullen or her estate to Commercial. The interest on these notes during the period January 1, 1956 through August 31, 1962, as debited to 1119 Gertrude's account and reflected on Commercial's books, amounted to $7,455 for each full year involved and $4,970 for the taxable period January 1 to August 31, 1962. During this period no interest was ever actually paid on the notes running from Gertrude Cullen to the corporation, either by Gertrude in her lifetime or by the estate after her death. However, the corporation accrued the note interest on its books and *93 it was included in the interest income reported on each of the corporate income tax returns filed during the years 1956 through August 31, 1962, inclusive. For the years 1959, 1960, 1961 and the taxable period ending August 31, 1962, the entire period of its administration, the Estate of Gertrude Cullen, a cash basis taxpayer, deducted the interest, which had accrued in favor of Commercial Finance Company and had been debited to her account, in its fiduciary income tax returns. At trial and in their petitions, petitioners conceded that Gertrude's estate was not entitled to deduct these interest payments. It is beyond doubt that Commercial was an accrual basis taxpayer. In its 1945 income and excess profits tax return Commercial stated that the accrual method was used; its returns for the years 1953 and 1954 also specifically state that the accrual method of accounting was employed. In the only ledger presented at trial and introduced in evidence, the entries in Commercial's discount account reflect that for many years and the years before us interest was credited at year's end on these obligations from Frank, Frank's estate, Gertrude, and Gertrude's estate. No change in accounting *94 method took place nor was permission to make such a change requested of respondent. The evidence clearly demonstrates that Commercial properly accounted for and reported its income on the accrual basis. Commercial's own accountant testified to this effect. Commercial Finance Company properly employed an accrual method of accounting in calculating and reporting its income. The notes running from Gertrude Cullen to Commercial Finance Company were executed in 1955. The reason for their execution, however, has roots in the history of the corporation, dating back to the period when Commercial was urn by and under the stewardship of Gertrude's husband, Frank C. Cullen. In effect, as has been mentioned, these notes were replacements for a set of promissory notes running from Frank to Commercial; Frank's notes were secured by deeds of trust on several parcels of real property which he owned on Broadway in Denver and which were inherited by Gertrude at his death. The outstanding deeds of trust constituted encumbrances which Gertrude, or petitioner Neil Cullen acting for her, wished to have removed as to one of the parcels. This was accomplished through the execution of new notes on Gertrude's *95 behalf as consideration for Commercial's releasing the encumbrance on the particular parcel which Neil, Gertrude, or both desired to be free and clear of any encumbrance on the title. More specifically, Frank C. Cullen owned for many years prior to his death four parcels of real property in the 1000 and 900 blocks of Broadway in Denver. The four parcels are contiguous to each other along Broadway, which runs north and south, except that the northernmost parcel, 1000 Broadway, is separated by 10th Avenue from the three remaining parcels which are located to the south in the 900 block of Broadway. After 1000 Broadway, proceeding in a southerly direction, Frank Cullen owned the three properties known respectively as 980 Broadway, 950 Broadway and lots 11 and 12, Block One (1), First Addition to Arlington Heights, Denver, Colorado. Lots 11 and 12, supra, which form a single parcel facing Broadway and which are immediately to the south of 950 Broadway, are not identified of record by a street address. For convenience, we shall refer to lots 11 and 12 as parcel four. At various times prior to or during World War II, but before the end of June 1944, Frank Cullen had encumbered all or *96 almost all of the above-mentioned Broadway property with deeds of trust, and subsequently, but before the end of June 1944, had obtained releases of these encumbrances. However, during June of 1944, Frank again conveyed the Broadway property as security for loans from Commercial Finance by executing two deeds of trust which encumbered the property in favor of Commercial. One of the June 1944 deeds of trust encumbered 1000 Broadway and recited that it secured a note running to Commercial in the amount of $90,000. There had previously been an old trust deed to Penn Mutual Life Insurance Company securing a $90,000 loan on this property which was released a week following the new $90,000 loan on 1000 Broadway. The other indenture of June 1944 covered all the Frank Cullen property in the 900 block of Broadway and secured a note running to Commercial in the amount 1120 of $130,000. The total of Frank's indebtedness on loans represented by the new notes, secured by these 1944 deeds of trust was therefore $220,000. Approximately one year later, in July of 1945, Frank Cullen decided to encumber the three parcels in the 900 block separately. The three parcels in that block were then subject *97 to the blanket encumbrance of June 1944 which covered all the Cullen property in the 900 block of Broadway. On July 2, 1945, the blanket deed of trust on the 900 block property was released and three separate deeds of trust were executed by Frank Cullen so that each parcel of his real estate in that block was now encumbered by a separate deed of trust running to the benefit of Commercial Finance Company. The trust deed covering 980 Broadway recited that it secured a note running to Commercial in the amount of $18,000; the deed covering 950 Broadway recited that it secured a note running to Commercial in the amount of $105,000; and the deed covering parcel four (the southernmost parcel) recited that it secured a note running to Commercial in the amount of $7,000. Accordingly, the total indebtedness recited as being secured by the 900 block property remained at $130,000. The deed of trust, executed in June 1944 which encumbered 1000 Broadway was not released at this time, so that the total indebtedness secured by the indentures outstanding against the Broadway property in July of 1945 remained at $220,000. None of the notes which were secured by the 1944 or 1945 deeds of trust were *98 introduced into evidence. There can be no doubt, however, as to their existence. In the balance sheets attached to its 1945 income tax return, signed by F.C. Cullen, president, Commercial Finance reported notes and accounts receivable at the beginning of the year of $293,147.75, and at the end of the year of $273,256.20. Frank's account on Commercial's books reflected that on June 15, 1944, he was credited with $220,000. The entry indicates that this was "Notes on 1000 & 950 Bdy. to renew C.F. Co. notes on same. Interest = 4578.18." A debit of $207,916.66 the same date in the same entry appears in the ledger. Thereafter, an entry in Frank's ledger account on December 30, 1944, reflects a debit of $3,850 for interest from July 31 to December 31 on the Commercial Finance loan. The following year Frank's account was charged with $7,700 on December 31, 1945, for interest due Commercial from him for the year, as it was likewise charged with interest on December 31, 1946. The total surplus and undivided profit of Commercial Finance Company in 1944 and before the war were more than adequate to cover withdrawals totaling $220,000. Throughout its corporate existence it had net taxable income *99 in excess of $400,000. At the end of 1944, the capital account amounted to some $322,437, according to a reconstruction of it based on Commercial's income tax returns as filed since 1913. Earned surplus at the end of that year was $122,437, and it exceeded $100,000 each year from 1939 on except for 1940 when it was $99,850. Total paid-in surplus and undivided profits for the total period 1913-1962 according to an analysis of the corporate tax returns amounted to $470,864. The record does not reflect when Frank's first loans from the corporation were made. Obviously, they preexisted the June 1944 renewal notes. Petitioners have not established that when Frank's original loans from Commercial were effected, the corporation was not in a financial situation to make them. It obviously had been a very successful operation over the years. In its 1945 return Commercial reported earned surplus and undivided profits of $122,437.87 at the beginning of the year and $127,510.68 at the end. The deeds of trust on the Broadway property running to the benefit of Commercial were claimed as mortgage or lien deductions on Frank's estate tax return signed by Neil as "executor" and in the schedule, *100 notes of even date were listed. Also in Frank's estate tax return, Neil, as executor, reported that Frank's interest in Commercial Finance as of the date of his death, June 17, 1947, consisted not only of 964 shares of preferred stock valued at $211,164, but also that as of the date of death Frank was entitled to a credit balance of $8,418.51 as shown "in ledger" from Commercial Finance Company. This balance, an asset of Frank's estate as returned, had been reduced by all of the debits for interest on the Commercial Finance loans made throughout the years on the ledger account. As mentioned previously, no dividends have ever been paid by the corporation. We can only conclude that Frank Cullen, a major stockholder and president of Commercial Finance, withdrew money from the corporation and gave back notes to represent his indebtedness. The deeds of trust which secured this indebtedness and which.$1121 have been admitted into evidence before us constituted valid and very real encumbrances upon the title to the Broadway property. They were so recognized and treated by Neil throughout the years both as an officer and stockholder of Commercial, as custodian of Commercial's records and *101 as a fiduciary. On Commercial's ledger Frank had a credit balance of $10,256.39 as of January 1, 1944, the date the ledger begins. Thereafter until his death on June 17, 1947, his account was credited with many items and debited with many expenditures, including interest on his notes totaling, in amount, $23,825.18. According to the estate tax return filed by Neil as Frank's administrator c. t. a. on September 15, 1948, Frank's credit balance was $8,418.51, on the date of death. If the interest was not due and properly charged as petitioners now contend, Neil should have reported an asset of at least $32,243.69 as the credit balance due Frank from Commercial as of the date of his death in lieu of the $8,418.51 reported. On June 30, 1947, within two weeks after his death, Frank's account on Commercial's books reflected a credit balance of $5,909.67, after another interest charge of $3,850 had been debited as of that date for interest "on loan 1/1/47 to 6/30/47." Thereafter during the administration of Frank's estate, Neil continued to debit Frank's account, which was carried along without even indicating that Frank was dead, with interest on the loan annually or semiannually until *102 December 30, 1950, totaling another $26,950. Thus all told through the years from 1944 until 1951, when the old notes and deeds of trust given by Frank were transferred to Gertrude's account and the interest was switched and charged against Gertrude on Frank's notes, Frank's account was debited a total of $54,625.18 for interest. On December 30, 1950, the date used to reflect conclusion of the administration of Frank's estate, his account reflected a debit balance of $17,787.78. Without the interest debits charged against it, however, it would have shown as of that date a credit balance of $36,837.40. Thereafter Gertrude was charged interest on Frank's notes and deeds of trust until December of 1955, when they were released by Neil acting on behalf of Commercial. Gertrude's account was debited with annual interest totaling $38,500 on Frank's loans from December 30, 1950 through 1955. Thereafter, from January 1, 1956, until the date of her death in December of 1958, Gertrude was charged with interest totaling $22,365 on her own new notes and deeds of trust. As of the date of her death, Gertrude's account on Commercial's ledger showed debit balances of $29,933.64 (regular account) *103 and $88,431.99 (Remodeling Bldg. at 950 Broadway), a total of $118,365.63. The debit balance of $17,787.78 reflected on Frank's ledger account with Commercial had been transferred to Gertrude's general ledger account and charged against her in December of 1958, and was therefore included in that total debit figure. Through the years since January 1, 1944, when the ledger presented in evidence begins, total interest was charged on Commercial's books and records against Frank and Gertrude on their loans as follows: January 1, 1944 to June 17, 1947 (date of Frank's death)
$ 23,825.18
June 17, 1947 to December 31, 1950
30,800.00
January 1, 1950 to December 31, 1958 60,865.00
Total interest on Commercial Fi- nance loans to Frank and Gertrude
$115,490.18 Without these debits to the respective accounts on Commercial's ledger, Gertrude's debit balance on the books at the date of her death would have been only $2,875.45 in lieu of the $118,365.63 shown on the ledger accounts, deducted as a debt of the decedent on her estate tax return and reflected as an asset of Commercial Finance upon its liquidation in 1962. Upon Frank Cullen's death in 1947, Gertrude Cullen, as *104 his sole devisee, inherited all the Broadway property. This property was subject to the deeds of trust described above which ran to the benefit of Commercial Finance Company in the total amount of $220,000. At this time and at all times until her death, petitioner Neil R. Cullen was exercising virtually untrammeled authority over Gertrude's business and financial affairs in Denver. In 1955 it became advisable to improve the parcel of realty located at 950 Broadway. This was rental property which had been occupied by a Government agency and which, if improved, could be rented to a mutual fund. It was deemed necessary to obtain a loan in the amount of $300,000 to make the necessary improvements and apparently it was deemed desirable to offer the 950 Broadway property itself as security for the loan. On December 19, 1955, petitioner Neil Cullen, acting for Gertrude Cullen and as vice president of Commercial, released the existing Frank Cullen deeds of trust on all four parcels of Gertrude's Broadway property; these totaled $220,000 in amount. In substitution for these deeds 1122 of trust new deeds of trust were executed as follows: A trust deed on 1000 Broadway securing a note to *105 Commercial in the amount of $175,000 and a trust deed on 980 Broadway securing a note to Commercial in the amount of $38,000. The new notes secured by these deeds of trust were signed "Gertrude Cullen by Neil R. Cullen, power of attorney." They were payable in ten years and bore interest at the rate of 4 percent per year. However, the deeds of trust were signed "Gertrude Cullen" without indicating that Neil had signed them as her attorney in fact, and the notarial acknowledgments recited that the instruments were acknowledged before the notary by "Gertrude Cullen." The effect of the above-described transactions left Gertrude's title to 950 Broadway free and clear of any encumbrance so that a loan from the First National Bank of Denver could be arranged. Parcel four, consisting of lots 11 and 12, Block 1 of the First Addition, was now also free from any encumbrance. The bank loan was arranged and on January 11, 1956, a deed of trust on 950 Broadway, securing a $300,000 note from Gertrude Cullen to the bank was recorded. This deed of trust was executed "Gertrude Cullen by Neil R. Cullen attorney in fact." The total amount of Gertrude's new deeds of trust in favor of Commercial and *106 the underlying notes to Commercial came only to $213,000. Her husband's notes and deeds of trust which had been released and were replaced had amounted to $220,000. The difference of $7,000 was handled on Commercial's books by debiting Gertrude's account in the amount of Frank's four deeds of trust, $220,000, and by crediting her account for the amount of her own new notes, $213,000. The effect of this accounting was to increase Gertrude's debit balance on Commercial's books by $7,000. At trial petitioner Neil Cullen explained this accounting and the fact that Gertrude's new notes did not equal the full $220,000, as follows: Q. What was the purpose of changing the amount? A. As I said before, merely to reduce the amount on the property. It would look better to anybody who wanted to buy it. The figure was reduced, in Neil's own words "to make a better picture on the books." However, the fact is that lots 11 and 12, Block 1 of the First Addition, which had previously been covered by Frank's deed of trust to secure a note in the face amount of $7,000, were free and clear in Gertrude's hands and not covered by any of her subsequently given deeds of trust held by Commercial Finance. *107 As to this $7,000 debt, Commercial held an open account debit balance instead of a note secured by deed of trust. As has been mentioned, Commercial regularly treated the interest due on Gertrude's notes as real and owing, even to the extent of reporting and paying Federal income taxes on the interest which accrued. Further, Gertrude's account on Commercial's books was debited by the amount of interest due from her at each year's end. This was the treatment accorded the various disbursements petitioner Neil made for Gertrude's benefit, and, as already pointed out, the debiting of the annual accrued interest contributed substantially to the amount of the debit balance disclosed on Gertrude's open account with Commercial at the time of her death. Consistently, the amount owing on Gertrude's ledger accounts with Commercial at the time of her death ($118,365.63) was claimed as a debt deduction on Gertrude's estate tax return, it being described as an overdraft by the decedent in her account with Commercial Finance. The parties are agreed that no interest was ever actually paid by Gertrude or her estate, but the estate, a cash basis taxpayer, nonetheless deducted the yearly interest *108 payments. Petitioners now concede that this deduction was improperly claimed for each year. Moreover, the principal amount of the deed of trust debt ($213,000) was claimed as a deduction for mortgage liens against the decedent's real property in the estate tax return of Gertrude's estate. Even though the parties are now agreed that the estate never paid the interest due on the notes, petitioner Neil, as Gertrude's executor, listed the interest to Commercial as disbursements of the estate in his report to the Denver County Court. He even issued and signed receipts as president of Commercial Finance acknowledging receipt from the estate of interest, as follows: Date
Description
Amount
Dec. 29, 1960
Interest on Note
$7,455
Dec. 28, 1961
Interest on Note
7,455
Aug. 31, 1962
Interest on Note from 12/31/60 to 12/31/61
7,455
Aug. 31, 1962
Interest on Note from 12/31/61 to 8/31/62
4,970 These receipts were filed with the Probate Court, City and County of Denver. Neil's 1123 report of his administration of Gertrude's estate was approved. Accordingly, both as to principal and interest, Gertrude's estate and Commercial treated the notes to Commercial as *109 bona fide for all Federal tax purposes and for some purposes unrelated to tax matters. The notes which petitioner Neil executed on Gertrude's behalf in 1955 were supported by valuable consideration. In return for the new notes and new deeds of trust (which covered 1000 Broadway and 980 Broadway only), Gertrude received the release of her husband's deeds of trust and clear title to the property at 950 Broadway, thus making possible the procurement of a $300,000 bank loan secured by the property itself. Petitioner Neil Cullen testified initially that he had no authority to execute the new promissory notes on behalf of his sister-in-law, Gertrude Cullen. However, he signed the 1955 promissory notes in a manner clearly indicating that he acted as Gertrude's agent with power of attorney so to act. Ever since Gertrude's departure from Denver, he had acted for Gertrude in all her business affairs and had exercised almost complete control over these affairs. In executing the deed of trust which secured the $300,000 loan from the First National Bank of Denver, Neil signed the indenture as "Gertrude Cullen, by Neil R. Cullen, Attorney in fact." This arrangement and Neil's signature were *110 accepted by the bank in an arm's-length commercial transaction. The bank thereafter advanced $125,000 on this loan and Neil repaid $30,000 of this principal sum to the bank with Gertrude's funds before her death; he reported the unpaid balance of $95,000 as a debt of the decedent on the Federal estate tax return and was allowed a deduction therefor; thereafter during the administration of the estate, he made further substantial payments on the loan with estate funds, which payments were approved and allowed in his accounting to the Denver County Court. Neil acted for Gertrude under her authority and as her agent and advisor throughout the years; she reposed absolute trust and confidence in him, accepting the benefits and the liabilities resulting from all of his actions without question. Neil's acts on her behalf were her acts, ratified and confirmed by her acquiescence and unquestioning acceptance. While no written power of attorney was produced at trial, the entire record convinces us that one existed authorizing Neil to act in all capacities for Gertrude. We need not repeat again all of the many acts that were repeatedly performed over many years that demonstrate that this was *111 the fact of the matter. The notes and deeds of trust, which petitioner Neil Cullen now seeks to repudiate and nullify, were made by him for Gertrude and were her obligations from which she reaped benefits; he was her attorney in fact throughout the years. In 1958, upon Gertrude's death, petitioner Neil, named by her will, qualified as the executor of her estate. Thus, during the period of administration which ended on August 31, 1962, Neil continued to exercise control over the property which had been Gertrude's. It is not mere coincidence that the effective liquidation date of Commercial Finance Company, August 31, 1962, coincides with the closing date for Gertrude's estate. The entire record indicates that the winding up or liquidation of Commercial Finance Company was administered and accomplished in pari materia with the settlement and distribution of Gertrude's estate. Gertrude had been the majority stockholder in Commercial, and, more important, her estate had outstanding against it the two large notes of 1955, described in detail above, which ran to the order of Commercial. Further, Commercial's only assets of any consequence consisted of these two notes executed on Gertrude's *112 behalf and the large debit balance in her account. Gertrude's estate was quite solvent, being valued by Neil as executor at approximately $900,000 after all deductions, including, of course, debt deductions for the two notes to Commercial and the one note to the First National Bank of Denver as well as the open account balances. Gertrude's shares, both common and preferred, in Commercial Finance Company were valued on her estate tax return in the total amount of $251,332.48. All other securities held by the estate were sold in the course of administration. Petitioner Neil R. Cullen and petitioner Marian Warfield Hefferlin, Gertrude's grandniece, were the residuary beneficiaries of Gertrude's estate. Marian received a threefourths interest in the residue and Neil received a one-fourth interest. In addition, each received certain specific bequests or devises before taking as residuary beneficiaries. Petitioner Marian W. Hefferlin received the following specific gifts: 1124 1. 1200 Bannock Street, Denver, Colorado. This property was valued in the estate tax return at $55,000 and produces a net rental income of approximately $7,000 annually. 2. A specific legacy in the amount *113 of $25,000, which was paid on or about June 14, 1961. 3. A specific legacy of Gertrude's partnership interest in the Cullen-Thompson Motor Company. This was valued in the estate tax return at $89,590.11 and subsequently was purchased from Marian by Neil under a deferred payment plan. Petitioner Neil Cullen received a specific devise of the realty known as 350 Humboldt Street, Denver, Colorado. This property was valued in the estate tax return of Gertrude Cullen at $37,500. Neil still owns this property. Included in the residue of Gertrude's estate was the Broadway property which Gertrude had inherited from her husband, Frank, at his death. This was for all practical purposes the only property remaining in the estate after payment of bequests, debts, taxes and expenses of administration. In late August or early September, Marian went to Denver to discuss with Neil the arrangements and an agreement for the division of the assets and a complete settlement of the estate administration and the dissolution of Commercial. For sentimental reasons, Neil desired to own 1000 Broadway, which had been the site of Cullen-Thompson Motor Company, so he and Marian entered into an agreement whereby *114 he would take 1000 Broadway outright, Marian would take 950 Broadway and parcel four outright, and the 980 Broadway property, which would separate Neil's property from Marian's, and which was used as a parking lot for 1000 Broadway, would be held by them as cotenants under the three-fourths, onefourth ownership arrangement called for by the will. They agreed that 980 Broadway would be so held and not sold for ten years, that Gertrude's estate be settled as reported by Neil to the Denver Probate Court and that Commercial Finance be dissolved and its deeds of trust on the Cullen property released. Neil gave up any further claims he might have against Commercial Finance and they further agreed that the five alleged escrow stockholders each be paid $10,000 for their stock in Commercial. The division of the Broadway property by the residuary devisees was based on the valuations placed upon the respective parcels in the estate tax return and the value of their interests in Commercial. On the estate tax return, each parcel mentioned above is not valued separately; therefore, it is impossible to determine exactly the extent to which the division of Gertrude's Broadway realty accorded with *115 the residuary provisions of her will. It is apparent, however, that Neil received real property worth considerably more than one-third the value of the realty received by Marian. As mentioned, Neil received 1000 Broadway outright under the agreement. This parcel was valued, together with 980 Broadway, at $201,500 on the estate tax return but it was subject to a deed of trust held by Commercial for $175,000 so that the estate's equity in this parcel was not large. Neil had a one-quarter undivided interest in 980 Broadway and Marian a three-quarters interest. Marian, of course, took 950 Broadway and parcel four outright. These two latter parcels were valued together on the estate tax return at $319,000, and were only encumbered by deed of trust with an unpaid balance of $20,000 held by the First National Bank. The value of 980 Broadway was approximately one-third of the combined $201,500 value for both 1000 and 980 Broadway. 980 was relatively unimproved, having only a single small structure suitable for an office with telephone. 980 had been used as a parking lot, and Neil desired that it continue to be used as such so that his 1000 Broadway property would have more utility. It *116 was subject to deed of trust of Commercial Finance for $38,000. In 1958, for property tax purposes, 1000 Broadway had been assessed at approximately three times greater value than 980. Accordingly, we are convinced that 1000 Broadway alone was worth some $133,000, and Neil's one-quarter interest in the $67,500 value we allocated to 980 Broadway came to some $16,800. Therefore, under the agreement with the deeds of trust extinguished, Neil's total interest in all Gertrude's Broadway property amounted to approximately $150,000. The total value of the Broadway realty taken by Marian outright was in the neighborhood of $319,000, subject however to a $20,000 deed of trust, which she assumed, and her undivided interest in the 980 property came to approximately $50,000 without Commercial's deed of trust encumbrance. 1125 These final values indicate rather conclusively to us that the one-quarter, threequarters division of the residuary realty envisaged by the will was not strictly adhered to in the agreement between Neil and Marian. Neil took residuary real estate having a value of approximately $150,000; Marian took residuary real estate having a value of approximately $349,000. Under *117 the agreement they entered into, Marian did not take three times greater value than Neil, this latter ratio being the testatrix's apparent intention. If the encumbrances held by Commercial had no value and were unenforceable as now contended, Neil and Marian would have divided on a 25 percent-75 percent basis the Broadway properties having a value of $520,500. Neil's share would have been only $130,125 and Marian would have received a share of $390,375. As a part of the settlement of both the estate and the dissolution of Commercial, Marian executed a petition to the Denver County Court while she was in Denver in September of 1962, requesting that Neil's account as executor of Gertrude's estate be accepted and approved without "the usual vouchers thereto attached." This petition which was verified before a notary public on September 10, 1962, was subsequently filed with the court in January of 1963. Neil's petition for approval of expenditures in the Cullen estate and his account were also filed in January of 1963 and were approved by the County Judge. In the petition it was prayed that all payments be approved without the necessity of "claims being filed therefore [sic]" and *118 it was so ordered by the court. In this report to the Probate Court, Neil showed a credit of the amounts of $11,671 and $3,890, respectively, on August 15, 1962, as Marian's and his shares of the balance of cash needed to balance his account as executor of Gertrude's estate. This division of the estate deficit in the accounting to the court corresponded exactly with the testatrix's wishes as to the division of her residuary estate as expressed in her will. On that date, August 15, 1962, Commercial's books showed a debit balance of $15,536.93 in the account of Gertrude Cullen's estate. (The discrepancy of $25 in the totals is due to an error in the court accounting, which omitted a $25 credit shown on Commercial's books.) In connection with the settlement between Neil and Marian both parties used and relied upon the values used for estate tax purposes and the liquidation of Commercial Finance according to the report of its own C.P.A. on the value of liquidating distributions. Neil surrendered any claims he had against Commercial. As has been mentioned, Commercial Finance Company was formally dissolved as of August 31, 1962. Its final income tax return was filed for the period January *119 1 to August 31, 1962. The Broadway property which petitioners Neil and Marian took as Gertrude's residuary devisees was, of course, subject to the deeds of trust for the use of Commercial, which, with the underlying notes and Gertrude's debit balances in her accounts, constituted Commercial's only consequential assets. On August 31, 1962, petitioner Neil R. Cullen held 536 shares of Commercial's preferred stock and 1,786.5 shares of its common stock. The Estate of Gertrude Cullen on that date (its own closing) held 464 shares of Commercial's preferred and 3,213.5 shares of its common. As a residuary legatee under Gertrude's will, Neil was also entitled to a one-fourth interest in Commercial's stock held by the estate. At the time of Commercial's dissolution, its certified public accountant prepared final financial statements from the corporate books and records which included a statement of liquidating dividends distributable to the shareholders. According to this statement, Neil was entitled to a liquidating dividend with respect to his 536 shares of preferred stock in the amount of $53,600. With respect to the common, he was entitled to a liquidating dividend amounting to $90,645.25. *120 Thus, the total dividends in liquidation which were distributable to Neil and attributable to his personally owned stock totaled $144,245.25. Additionally, Gertrude's estate was entitled to a liquidating dividend of $46,400 with respect to its preferred stock and a dividend of $163,049.82 with respect to its common stock. Accordingly, Neil's one-fourth interest in the total liquidating dividends distributable to the estate amounted to $52,362.45. Marian W. Hefferlin, against whom transferee liability has not been asserted with respect to Commercial, was, of course, entitled to the remainder of the total liquidating dividends distributable to the estate, $157,087.37. She was beneficiary of three-fourths of the residuary. With the exception of payments made to the five minority preferred shareholders, allegedly beneficiaries of an escrow, whose names have been listed above in our finding as to Commercial's stock ownership, liquidating dividends were not paid in cash 1126 but were made by what amounts to a distribution of assets in kind to Neil R. Cullen and Marian W. Hefferlin, Gertrude's residuary beneficiaries. The record does not disclose the precise source from which the five *121 minority preferred shareholders were paid their cash dividends in liquidation and the evidence is in conflict, Neil having stated positively that they were paid "out of the Estate." We conclude, however, that the minority preferred shareholders were paid with funds from Commercial's bank account, which funds had probably been originally derived from Gertrude's property and assets, but which had been credited to her account on Commercial's books when received. They were neither reported to the Denver County Court as funds on hand in Neil's executor's account nor were the payments to the minority preferred shareholders shown as disbursements from the estate. As mentioned already, Neil and Marian reached an agreement governing the division of Gertrude's Broadway property between them. It was in effectuating their agreement for a division of the real estate that Neil and Marian effectively distributed Commercial's assets to themselves. Involved as a necessary concomitant of this division of the Broadway property was a cancellation and release of the deeds of trust and notes owing from the estate to Commercial, without which the Broadway property would have been encumbered to the extent *122 of $213,000 and of considerably less value. The property which Neil received from the estate, 1000 Broadway, had been encumbered by a deed of trust for $175,000. This deed of trust was released and the related note marked "paid in full" on December 17, 1962, after the effective date of Commercial's liquidation or dissolution. Likewise the $38,000 note and trust deed on 980 Broadway which Neil and Marian owned in common was canceled and released the same date. As already found, Gertrude's estate was highly solvent; Commercial, or Neil and Marian, after a distribution of the notes to themselves, could have enforced these obligations and the deeds of trust against the estate or the encumbered property in it. As mentioned, the estate deducted its indebtedness to Commercial for estate tax purposes. However, Neil and Marian obviously preferred that neither they nor Commercial should enforce its claim against the Broadway property which they would take subject to Commercial's lien. If Commercial had remained in existence following distribution of Gertrude's estate, Neil would have controlled the corporation. The agreement to divide the residuary realty so that Neil took more than his *123 testate share represented, at least in part, an informal enforcement of Commercial's Gertrude Cullen notes against her estate. Marian would not have been willing to engage with Neil in the trade of realty in Gertrude's residuary estate "if there had been any encumbrances on the property other than that [$20,000] to the First National." In essence, the value of the encumbrances and underlying notes were transferred to Neil and Marian as effectively as if there had been a formal assignment. Neil, against whom transferee liability is asserted with respect to Commercial's deficiencies, was benefited to the extent that 1000 Broadway, which he wanted to obtain and in fact did obtain, was more valuable unencumbered than encumbered. On the evidence of record, it is not possible to make an exact finding of the value of Commercial's distribution (release) to Neil. 1000 Broadway may not have had a fair market value equal to the $175,000 encumbrance. As mentioned, it is not valued separately on Gertrude's estate tax return. Rather, it is valued together with 980 Broadway at a combined fair market value of $201,500. In any event, we believe it evident that very substantial value was received *124 when the deeds of trust were canceled. Neil himself placed a substantial value upon the distribution to him on his individual Federal income tax return for 1962. On this return Neil reported a long-term capital gain of $72,780.25 upon the surrender of his shares in Commercial at its dissolution. This gain was based on a reported "Gross sales price" of $90,645.25. Neil also reported in his fiduciary income tax return for Gertrude's estate that it had realized a long-term gain of $8,117.34 on the Commercial stock sold August 31, 1962, for a gross sales price of $163,049.82. On the basis of the entire record, we conclude that Commercial effected a distribution to Neil which had a fair market value of at least $90,645.25, the amount he returned. The book value of the distribution to him, according to the final financial statements prepared by Commercial's certified public accountant, amounted to $144,245.25, a much larger figure. Neil gave up any "further claim" against Commercial as part of his settlement with Marian in which he acquired 1000 Broadway free and 1127 clear of encumbrance. This consideration, however, ran to Marian not to Commercial. Actually in effect what occurred *125 was a distribution of all assets of Commercial to Neil and Marian according to their respective interests and a subsequent division and reshuffling of those interests between them in the settlement of Gertrude's estate. Following the distributions in liquidation described above, Commercial was left without any assets and it was therefore unable to satisfy the income tax deficiencies which were subsequently determined against it. These deficiencies have not been paid, and petitioner Neil R. Cullen paid no consideration for the distribution of assets he effectively received from Commercial. In October of 1963, according to Neil's testimony, Commercial moved from its historic address at 1000 Broadway, Cullen-Thompson Motor Company's old address, to a new address at 2320 West Fourth Avenue, which was either Neil's own residence or the new location of one of his various business enterprises. The 1000 Broadway address is the address appearing on the final corporate return filed for the period ending August 31, 1962, the date of its dissolution. Commercial had been dissolved for more than a year and had no legal existence in October of 1963. However, the existing and intact books and *126 records of Commercial were physically removed to the 2320 West Fourth Avenue address. During March of 1963, if not earlier, the Internal Revenue Service had become interested in, if not suspicious of, the activities and particularly the organization of the now defunct Commercial Finance Company. A revenue agent conferred with petitioner Neil at least once and examined Commercial's general ledger book at Neil's new Fourth Avenue address, after the move in October. After the first of the new year (1964), respondent wrote a letter to the defunct corporation, "Attention: Neil R. Cullen," at Neil's new Fourth Avenue address, noting that there was insufficient time for a complete audit, considering the statutory period of limitations and the years under consideration, and requesting that a consent (Form 872) be executed to extend the period in which an additional tax might be assessed. Neil would not execute consents for all the years under consideration by respondent and on March 10, 1964, respondent mailed the statutory deficiency notice to Commercial at 1000 Broadway, the address appearing on Commercial's final return, thereby making the formal determination of deficiencies in income *127 taxes for the taxable periods 1956 through August 31, 1962. Neil never filed with the district director any notice of fiduciary relationship with respect to the dissolved corporation. On June 4, 1964, he filed on behalf of Commercial a timely petition with this Court. Each of Commercial's income tax returns for the taxable periods January 1, 1956 through August 31, 1962, were timely filed. However, on each of these returns Commercial indicated that it was not a personal holding company and it failed to file for these taxable periods a Schedule 1120PH or any other schedule setting forth the information required by section 6501(f), I.R.C. 1954[2] to be given by personal holding companies. Further for the years 1956 and 1959 Commercial executed consents which were accepted by respondent on March 14, 1963, and which extended to June 30, 1964, the period within which an assessment could be made for those years. The notice of transferee liability with respect to Commercial's deficiencies was mailed to petitioner Neil R. Cullen on July 30, 1964. This notice *128 relates to deficiencies in income tax of the transferor, Commercial Finance Company, for all the taxable years 1956 through 1961 and the taxable period January 1 to August 31, 1962. In the course of respondent's investigation of Commercial's activities, it became apparent from the information given by petitioner Neil that the Estate of Gertrude Cullen had not actually paid the interest to Commercial Finance Company which it regularly deducted on its income tax returns. For the year 1959 the Estate of Gertrude Cullen executed a consent which extended to June 30, 1964, the period within which an assessment could be made for that year. Respondent accepted this consent on March 14, 1963. The proposed transferee liabilities in Docket Nos. 3987-65 and 3988-65 relate to income tax deficiencies of the Estate of Gertrude Cullen (Transferor) for the years 1959, 1960, and 1961. On April 6, 1965, respondent determined the deficiencies in issue against the estate and notices of transferee liability were mailed to each of the transferees, Neil R. Cullen and Marian Warfield 1128 Hefferlin, the same date. Those deficiencies have not been paid but they were conceded to be correct before or *129 at trial, with the exception of the $184.03 negligence penalty asserted under section 6653(a). No evidence was presented at trial which related to the penalty, nor is it mentioned on brief, and we deem that petitioners have abandoned this issue. The estate had no assets after debts, taxes, administration expenses and other obligations were paid and distribution of specific bequests and residuary devices were made. When the estate administration was concluded, all remaining assets became the property of the residuary legatees and devisees, Neil and Marian, the beneficiaries thereof. By stipulation of the parties filed herein, it is conceded that the Estate of Gertrude Cullen, Deceased, had capital gains in the year 1960 of $10,801.11 and was not entitled to a real estate tax deduction of $1,781.01 in 1959, all as determined by respondent. Neil and Marian were transferees of the assets of the Estate of Gertrude Cullen, Deceased, each one receiving assets of the estate without paying any consideration therefor, which exceeded in value the amount of the deficiencies determined against the estate by respondent. The statutory notice of deficiency to Commercial Finance Company determined *130 deficiencies for each of the years 1956 through 1961 on the ground of respondent's determination that Commercial Finance Company was a personal holding company as defined in section 542 (a) of the Internal Revenue Code, and therefore liable for the personal holding company tax. The only adjustments made for the period January 1 to August 31, 1962, were with respect to legal and accounting fees of $450, disallowed because such amount was deducted previously on a cash basis, and with respect to $117.26 claimed for Colorado income tax which was previously deducted on a cash basis. Neil was advised by the statement attached to the notice to him that the deficiencies determined against Commercial Finance represented his liability as a transferee of assets of that corporation. The adjustments for the period ended August 31, 1962, are not in issue or disputed here. Opinion As noted in our preliminary statement, eight issues remain for decision. Because these issues are for the most part susceptible of separate resolution and to some extent have already been resolved by our Findings of Fact, it seems convenient to treat each issue separately. However, at the outset *131 with respect to the entire case we must comment that the record herein leaves much to be desired; it is confusing, complex and full of conflicts and inconsistencies. Resolution of the many issues has been made extremely difficult not only by the sorry state of the record but also by the plethora of issues themselves, some of which cannot really be deemed valid or of any real substance albeit they are raised by the pleadings, were raised again at trial and covered by respondent's brief. Many of the arguments made, all of which have been carefully considered, are also insubstantial while seeming to be seriously advanced. The task of unraveling the tangled web of the thereads of the Cullen-Commercial Finance affairs has not been made easier by the fact that the only complete picture of the multitude of transactions over many years is contained in a watersoaked ledger, moldy and mildewed, with entries sometimes completely washed away and sometimes blurred and water-washed so as to be illegible or worse. Nevertheless we have done the best we can to resolve all issues in the light of all of the difficult circumstances. One of the issues raised at trial on which substantial evidence was *132 presented and about which respondent devoted a portion of his original brief has been conceded by petitioners in their original brief. This had to do with the validity of the deficiency notice to Commercial Finance Company and our jurisdiction with respect to its liability for the determined deficiencies for the years 1956-1961 and the period January 1, 1962 to August 31, 1962, when Commercial was dissolved. In view of petitioners' concession of this issue and on the basis of the record we conclude that the deficiency notice mailed to Commercial on March 10, 1964, was valid. The principal remaining issue, overshadowing all others herein, is whether or not Commercial Finance Company had interest income from the promissory notes, secured by deeds of trust, of Gertrude Cullen. Petitioners urge that the substance of the transactions must prevail over the form; that the notes in question were executed by Neil Cullen for Gertrude, without authority, and were nullities so that no interest was ever due nor was it ever intended that interest be collected or paid thereon; and finally that 1129 the transactions were merely paper transactions and shams and did not involve "any real money". *133 Resolution of this issue affects some of the other issues directly and permeates the entire case apart from the various other technical issues presented. We shall proceed to resolve the various issues as they are presented by the parties and outlined earlier in our preliminary statement of the case. I. Whether Commercial Finance Company is subject to tax as a personal holding company. Corporations which fall within the statutory definition of "personal holding company" are subject to tax under section 541 of the Internal Revenue Code. During the years in issue with respect to Commercial, section 542 provided in pertinent part as follows: (a) General Rule. - For purposes of this subtitle, the term "personal holding company" means any corporation (other than a corporation described in subsection (c)) if - (1) Gross Income Requirement. - At least 80 percent of its gross income for the taxable year is personal holding company income as defined in section 543, and (2) Stock Ownership Requirement. - At any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned directly, or indirectly, by or for not *134 more than 5 individuals. The statute thus establishes a stock ownership test and an income test. Section 543 defines personal holding company income as including, inter alia, interest. We hold that both tests were met by Commercial during the taxable years 1956 through 1961, unless, as shall be discussed infra, the corporation mistakenly accrued and reported its interest income. As to stock ownership, there can be little question. At all times during the taxable periods involved, Gertrude Cullen or her estate and Neil R. Cullen together woned two-thirds of all the preferred and the total amount of Commercial's outstanding common stock. Actually the record justifies the conclusion that Neil and Gertrude (or her estate) owned 100 percent of the stock of Commercial. True the parties have stipulated the stock ownership as set forth in our findings, including escrows for five named individuals of 500 shares of preferred stock of the 1,500 outstanding preferred shares. However, the evidence of record and the testimony of Neil Cullen at trial demonstrates that these individuals did not in fact own those shares in the years in question. Frank C. Cullen owned 964 shares of Commercial's *135 preferred stock as reported in his estate tax return at a value of $211,164.20 and Gertrude inherited his entire estate following his death in 1947; he died testate and she was his sole legatee and devisee under his will. When Gertrude died in 1958 she owned only 464 shares of Commercial's preferred stock; the 500 other shares which had been in Frank's estate were not otherwise accounted for at trial. Apparently there was an "escrow" arrangement at some unspecified date as to these 500 shares of preferred stock, but the written "letters of escrow", as it was described by Neil, was not produced at trial. Neil testified repeatedly that he never held any stock in escrow and that no stock was issued to the alleged beneficiaries of the escrow, but that the understanding had been that after Gertrude died he was to give 100 shares of Stock, or $10,000 apiece, to the five named individuals, allegedly the beneficiaries of the escrow arrangement, if the stock was worth anything. In Neil's own words, after several other conflicting statements about the matter, in response to a question asking if he held preferred stock of Commercial in escrow for anyone, he said: I did, yes. I really didn't *136 hold the stock. If I may, it was to be in the form of the stock, if it had any value, of the equivalent in cash. [Emphasis added.] Later when asked about distributions in liquidation of Commercial Finance in 1962, which according to its accountant's report and computation resulted in distributions from the corporation of $50,000 to the five named escrow beneficiaries, $10,000 apiece, Neil testified as follows: They never owned the stock in the beginning. It was given to me, a letter, to the fact that upon the death of Mr. Cullen and Mrs. Cullen, if the stock was worth anything, they were to get that amount either in stock or in the equivalent in cash. And they got the cash for it instead of stock. They never had the stock in their possession. [Emphasis added.] Later in his testimony about this Neil insisted that he had paid the five individuals $10,000 apiece as bequests from the Estate of Gertrude Cullen and that this was done with the permission of Marian Hefferlin, the other residuary beneficiary 1130 of that estate. He persisted that the balance of $56,723.27 on deposit in Commercial Finance Company's checking account on August 31, 1962, was Gertrude's money or money *137 of the estate, not the money of the corporation. No money on deposit in the Commercial account however was ever reported as an estate asset for estate tax purposes nor were any items of receipt or disbursement reported to the Denver County Court in Neil's accounting as executor of Gertrude's estate with reference to the cash in Commercial's bank account or the payments to the five individuals of their $10,000 distributions. As a matter of fact Neil's account in the probate court reflected that he had to balance receipts and disbursements with two credits totaling $15,561.93 on August 15, 1962, three-fourths thereof, $11,671.43, reported to be from Marian Hefferlin who was entitled to three-fourths of the residuary estate, and one-fourth thereof, $3,890.50, reported to be from Neil, himself, who was entitled to one-fourth of the residuary estate. It is obvious that on August 31, 1962, there was no cash in Gertrude's estate that could have been utilized to pay what Neil characterized on the witness stand as "indirect [bequests]." In any event, in spite of the conflicting evidence of record and whether or not Gertrude or her estate and Neil together owned all of the stock of Commercial *138 Finance or merely all of the common and 1,000 shares of the preferred, they owned together more than "50 percent in value of its outstanding stock", throughout the period here involved. Petitioners Neil and Commercial argue that the Estate of Gertrude Cullen is not an "individual" within the meaning of section 542(a)(2) and that after Gertrude's death, when the estate held her stock, Commercial no longer met the definition of a personal holding company. They urge that neither the Code nor the regulations mentions the term "estate" as being included in the definition of an "individual". However, this argument completely ignores the provisions of section 544(a)(1) providing for constructive ownership by certain classes for purposes of section 542(a)(2). Section 544(a)(1) provides in pertinent part as follows: (a) Constructive Ownership. - For purposes of determining whether a corporation is a personal holding company, insofar as such determination is based on stock ownership under section 542(a)(2), * * * (1) Stock not owned by individual. - Stock owned, directly or indirectly, by or for a corporation, partnership, estate, or trust shall be considered as being owned proportionately *139 by its shareholders, partners, or beneficiaries. Therefore, under section 544(a)(1), the stock held by Gertrude's estate must be considered as having been owned one-fourth by Neil R. Cullen and three-fourths by Marian W. Hefferlin, this fractional ownership being their proportionate interests in the residue of the estate. Accordingly, after Gertrude's death all of the stock was owned constructively by Neil and Marian with the possible exception of the 500 shares of preferred stock allegedly held in escrow for the so-called minority preferred shareholders. We conclude that the stock ownership requirement of section 542(a)(2) was clearly satisfied during each of the taxable periods in issue before us. Neil and Commercial also urge that they come within one of the exceptions presently found in section 542(c)(6) for lending or finance companies. Section 542(c)(6), however, did not exist in its present from during the years in issue. In those years, the exceptions dealing with the various forms of finance companies, instead of being consolidated in separate subparagraphs under section 542(c)(6), as they now are, were found in separately numbered paragraphs (6), (7), (8), and (9) under *140 section 542(c). See the changes made by Pub. L. No. 87-768, 76 Stat. 766 (1962) and the Revenue Act of 1964, section 225(c). It is sufficient for our purposes to point out that the hurdle which a finance company would face now in the present subparagraph (D) also constitutes an insuperable obstacle to any argument here that Commercial came within the finance company exceptions during the years in issue. Subparagraph (D) presently permits the exception only where "the loans to a person who is a shareholder in such company during the taxable year by or for whom 10 percent or more in value of its outstanding stock is owned directly or indirectly (including, in the case of an individual, stock owned by members of his family as defined in section 544(a)(2)), outstanding at any time during such year do not exceed $5,000 in principal amount;" similar provisions existed in each of the former paragraphs (6), (7), (8), and (9) under original section 542(c) and the 1962 amendment to it. In short, the loans outstanding to Gertrude and her estate, stockholders with more than 1131 10 percent ownership, clearly exceeded the $5,000 limit. Additional reasons also exist which exclude Commercial *141 from each of the original paragraphs (6), (7), (8), and (9) of section 542 (c), but we do not find it necessary to discuss them in great detail. We would point out that Commercial was not actively and regularly engaged in its business, which disqualifies it for exception treatment under former paragraph (9), and after December 31, 1961, former paragraph (7) as well. Commercial did not receive funds and issue in return installment certificates or certificates of indebtedness as required for exception treatment by former subparagraph (8). Commercial had loans outstanding which were for a longer term than 36 months, thus disqualifying it under former paragraph (7) until December 31, 1961. Petitioners have failed to prove that Commercial was a licensed finance company under state supervision as required by former paragraph (6) and it had interestproducing loans outstanding which in principal amount were beyond the statutory maximums for "small loans". For the reasons stated, we conclude that Commercial in each taxable period before us did not come within any of the then existing lending or finance company exceptions. Certainly, petitioners have not met their burden of proving that Commercial *142 qualified for exception treatment. See original paragraphs (6) through (9), section 542(c), Internal Revenue Code of 1954. Assuming then, that Commercial properly reported the interest income set forth on its return, which issue the parties have chosen to treat separately, it must be classified as a personal holding company; more than 80 percent of its gross income during all periods in issue was interest income, one of the forms of "personal holding company income" expressly listed by section 543. If the interest income from Gertrude's notes was properly accrued and reported, Commercial fell within both the stockownership and gross income provisions of section 542(a), which section defines personal holding companies. II. Whether Commercial Finance Company was an accrual basis taxpayer with respect to its income, and whether it properly accrued and reported the annual interest due on the Gertrude Cullen notes held by it. As reflected in our Findings of Fact, Commercial was on the accrual basis of accounting with respect to its income. Neil and Commercial argue further, however, that the annual interest on the Gertrude Cullen notes should not in fact *143 have been accrued or reported as income. They urge that the accrual and reporting were improper because Neil had no authority to execute the notes for Gertrude and because these notes were not supported by consideration. They urge that the notes were not legally binding obligations as to Gertrude. Our Findings of Fact clearly reflect why we must reject these arguments. We conclude that the notes were valid obligations of Gertrude's supported by valuable consideration and that Neil must have held a written power of attorney to act for Gertrude. It would serve no purpose to repeat here in detail the circumstances surrounding Neil's execution of the replacement notes on Gertrude's behalf or all of the reasons which compel our conclusion that Neil had written power of attorney to act for Gertrude. We are constrained to remark, however, that the facility with which Neil represented Gertrude in dealing with third parties suggests strongly that he had actual authority to act for her generally. For example, we think it unlikely that the First National Bank of Denver would lend Gertrude $300,000 on the 950 Broadway property with the note and security arrangement both being executed by Neil, *144 unless a power of attorney actually existed. It is incredible that a sophisticated financial institution would take the risk that its security arrangement and the note itself might prove invalid and worthless, where the debtor, Gertrude, was an elderly woman residing in a foreign country, and they dealt only with Neil Cullen in making the loan. The Bank actually advanced $125,000 on this loan, and there is no doubt that it was satisfied with Neil's authority to act on Gertrude's behalf. Neil does not even suggest that the note and related deed of trust on 950 Broadway in favor of the Bank were not valid and binding. He does, however, single out the Commercial notes as nullities. All through the years he recognized the validity and legality of this bank loan; he paid the bank annual interest and repaid $105,000 of the principal amount due with Gertrude's funds. Clearly, the deed of trust constituted an encumbrance on Gertrude's title to 950 Broadway after her death which Neil, as executor, fully recognized. When Marian Hefferlin took that property as part of her 1132 residuary estate share, she, too, recognized the validity of the lien; she assumed and agreed to pay the remaining *145 unpaid balance. Both Neil and Marian recognized the validity and value of all transactions when they agreed to pay $50,000 to the so-called escrow holders in 1962; these payments were only to be made if Commercial's stock had that value after Gertrude's death. The whole argument as to Neil's legal authority to execute notes and deeds of trust smacks of a much belated afterthought, conceived when the spectre arose that Commercial might be considered a personal holding company. Certainly petitioners have failed to prove that Neil was without authority to act for Gertrude or to legally bind her on the new notes and deeds of trust executed in 1955. The sole evidence that Neil Cullen was without authority to act for Gertrude when he executed the notes to Commercial Finance on December 19, 1955, consisted of his unsubstantiated and self-serving testimony denying that he had a written power of attorney from Gertrude or authority to act for her with respect to the matter. It ill-behooves him to take such a position here; he presented no substantiation whatever for his untimely denial save for his lawyer's general testimony that he could not find in official records a power of attorney *146 duly recorded to authorize the execution of trust deeds and that after the fact at some undisclosed date Neil had told him that he had no written power of attorney. We conclude and hold that the credible evidence of record indicates convincingly that Neil Cullen had Gertrude's power of attorney and full and complete authority to act for her in 1955. The new notes and deeds of trust from her to Commercial Finance to secure loans of $213,000 were valid and enforceable against her. Our findings reflect our conclusion that she reaped real benefits from the transactions which Neil handled for her. Not only were the old deeds of trust of her husband on all of her Broadway property released so that 950 Broadway was free and clear to be used as security for a $300,000 bank loan to remodel the building, but also another parcel was totally clear of mortgage. Neil as an officer and stockholder of Commercial consented and approved; he released the old trust deeds and accepted the new. His actions over the years belie his present protestations. There were glaring inconsistencies in Neil's testimony and throughout there appear flat contradictions between what he said under oath on the witness *147 stand and what he said under oath elsewhere, both for tax purposes in various and sundry returns over the years and in his pleadings filed herein as well as in his fiduciary reports to the Denver County Court. We must reject his testimony that he had no written power of attorney and was not authorized to act for his widowed sister-in-law throughout the years, and that the transactions lacked reality and were not intended to be as purported. They were in substance what they were in form. We conclude he was her attorney in fact, year after year, with her full knowledge, approval and acquiescence. Instead of holding that he had no power or authority to act for Gertrude, the credible evidence compels the conclusion that he held her written authority to act as her attorney and had complete power to do and perform the many acts he in fact undertook. Neil was a mature, knowledgeable, successful and experienced businessman; he kept detailed and meticulous records of receipts and expenditures he made on her behalf; he described himself as Gertrude's attorney in fact or merely executed documents in her name without disclosing the relationship; he endorsed her name on checks payable to her *148 order and deposited them in the checking account of Commercial Finance. He made out and executed Gertrude's individual income tax returns. We think it unlikely that Neil would have run the risk of a charge of violations of trust or law by his repeated actions which he now urges upon us as unauthorized by Gertrude. We choose not to believe his current but extremely tardy tale of the unreality of old transactions and his lack of capacity to act as Gertrude's agent throughout. He was her alter ego in Denver, and the notes and trust deeds he executed in December of 1955 were her legally enforceable obligations creating an indebtedness of hers to Commercial Finance to replace the earlier indebtedness of her husband, Frank, which was simultaneously released. Gertrude and her estate reaped the benefits derived from these transactions. Neil's acts on her behalf were her acts. [3]1133 We therefore conclude that the annual interest on Gertrude's two 1955 notes was due and owing on her debts to Commercial; it was properly accrued by Commercial, an accrual basis taxpayer. Commercial, therefore, satisfied the gross income requirement of section 542(a) (1) during the periods in issue and was *149 subject to tax as a personal holding company under section 541 as determined. III. If Commercial was a personal holding company, whether a dividends paid deduction is allowable in the computation of its personal holding company taxes. Section 545 provides that the undistributed personal holding company income is determined by deducting from taxable income (after certain adjustments) a "dividends paid deduction", as defined by section 561. Section 561 incorporates certain rules set forth in section 562 which in turn expressly adopts for the most part the general definition of "dividend" found in section 316. We find it unnecessary to consider in depth these detailed Code provisions. Petitioners' contention that Commercial is entitled *150 to a dividends paid deduction in the years 1956-1961, inclusive, is simply not supported by any view of the facts. No dividends were declared or paid during the years in issue, or, as best we can tell, in the company's history, except for the liquidating dividends or distributions in 1962. During the years no distributions as such were made to Gertrude as a shareholder during her lifetime or to her estate after death. Even if the distributions made to her or for her benefit are considered dividends, we think it clear that they would have been "preferential" within the meaning of section 562(c) and excluded for purposes of the "dividends paid deduction" by that section. Under no stretch of the imagination, however, can we view the evidence before us as sufficient to support the theory that distributions to Gertrude be considered dividends. As reflected by our Findings of Fact, the disbursements to Gertrude or on her behalf were loans or advances. We will not emphasize again the presence of the accepted indicia, so abundantly present, which have convinced us that the debit balance in Gertrude's account with Commercial created a debtor-creditor relationship between Gertrude and the *151 corporation. It is basic that a loan does not constitute a dividend; here the debits were in substance as well as in form debts due from Gertrude to Commercial. Respondent did not determine a personal holding company tax increase against Commercial for its final taxable period January 1, through August 31, 1962. For this period, the liquidating dividends mentioned in our Findings of Fact were more than ample to offset the undistributed personal holding company income. No issue as to these distributions is before us as to this short period. IV. Whether assessment against Commercial Finance Company of the deficiencies for the years 1956, 1957, 1958, and 1959 is barred by the statutory period of limitations. While petitioners have not conceded on brief that the notice of deficiency, mailed March 10, 1964, was within the applicable period of limitations, no argument whatever is presented on brief. We therefore assume the issue, raised by the pleadings and argued at trial is still before us. Respondent has argued it on brief. We conclude that section 6501(f), with its 6-year period of limitations applies. During none of the years in issue did Commercial indicate it was a personal *152 holding company or set out the information required to be given by paragraphs (1) and (2) of section 6501(f). Within the 6-year period for assessment, a consent was executed and accepted for the years 1956 and 1959 which extended until June 30, 1964, the period within which a deficiency might be assessed. The deficiency determination as to the years 1957 and 1958 is well within the 6-year period of limitations, the notice being issued on March 10, 1964. As to the year 1959, a fortiori there can be no question in light of the 6-year period set forth by section 6501(f). In any exent, as to 1956 and 1959 a timely consent extending assessment time to June 30, 1964, was executed so that the deficiency notice of March 10, 1964, was indeed timely as to those years. We conclude that deficiency determinations were timely, and not barred for any of the specified years. V. Whether petitioner Neil R. Cullen is liable as a transferee of Commercial Finance Company for its tax deficiencies. Respondent has determined deficiencies in income taxes against Commercial in the total amount of $16,745.76, plus statutory interest. The deficiencies remain unpaid. 1134 Commercial Finance Company *153 was formally dissolved as of August 31, 1962. On this date, petitioner Neil R. Cullen owned slightly more than one-third of both the preferred and common stock of the corporation. Additionally, under the will of Gertrude Cullen, he was entitled to a onefourth interest in the preferred and common stock, which Gertrude's estate owned. According to the final financial statement drawn up by Commercial's certified public accountant, which we conclude accurately portrayed Commercial's financial affairs at dissolution, Neil was entitled to a liquidating dividend of $144,245.25 with respect to his personally owned stock; the total liquidating dividend distributable to the estate came to $209,449.82, according to this final financial statement. Neil's one-fourth benefical interest in this latter amount was $52,362.45. There were five minority preferred shareholders, each of whom were beneficial owners of 100 shares of Commercial's preferred stock if the stipulated stock ownership is to be regarded as correct. These five persons, one of whom was Marian Hefferlin, each received a liquidating dividend in cash at the rate of $100 per share, the par value of the stock. This cash distribution, *154 therefore, totaled $50,000. As indicated by our Findings of Fact, supra, these cash distributions were paid out of the Commercial Finance Company bank account, with the consent and approval of both Neil and Marian. We stress again that Gertrude's estate did not list on its estate tax return the funds in this account as an asset of the estate, nor was it reported to the probate court. Commercial's books and records and its accountant's final report establish that the funds in this account were owned by Commercial. Whatever their original source, Gertrude or her estate had been given full credit on Commercial's books for all receipts of hers passing through Neil's hands. It is beyond doubt that the settlement of Gertrude's estate and Commercial's dissolution were being administered in pari materia. The administration of both can most charitably be described as "informal". However, they were handled together and concluded in whatever manner best suited Neil and Marian. They were the only two really interested parties, and they agreed on the division and settlement of both Commercial and the estate as they desired to accomplish it. However it is regarded, they wound up with all assets *155 of Commercial and the estate and divided them. Neil confirmed the understanding with Marian for simultaneous distribution of Commercial's assets and the settlement of Gertrude's estate in accordance with the agreement between the substantially interested parties in a letter to Marian written in November of 1962 as follows: You are correct in your understanding that in exchange for your interest in 1000 Broadway, and the ten year agreement on the vacant lots, I would give you my interest in 950 Broadway and relinquish any further claim to the remaining assets, if any, of the Commercial Finance Company. After converting the Marshall Note, the Ralph Cullen Note, the Ludlow accounts receivable and my own account receivable and then deducting expenses occuring [sic] since September 1st there remains $2,282.09 cash in the Commercial Finance account. The only remaining expense that might occur against this amount is the attorney's fee for closing the estate. The balance remaining after this fee has been paid will revert to you. I am enclosing a statement of the above analysis in detail for your records. You will note that both the Federal and State income taxes covering the period *156 from January 1, 1962 to August 31, 1962 have been paid. As to the mortgages on the buildings, the one covering 1000 Broadway was automatically cancelled by the transfer of that property to me for which I relinquished all my rights and interest in the stock owned by me against any further claims to the remaining assets of the Commercial Finance. The mortgage, ($20,000.00) covering the 950 Broadway Building, was assumed by you in our closing negotiations when you were in Denver. Of this, you have paid $10,000.00 leaving a balance of $10,000.00 of which $5,000.00 will be due in May and the remaining $5,000.00 in August. You and I will have to pay the 1962 property taxes on our respective properties which will be due one half in February and the remaining half in July. [Emphasis added.] As far as capital gains are concerned there will be none for you as all transfers are based on inventory value at time of death and there has been no appreciation in their value since that date. I will have to pay a capital gains of between $20,000.00 and $25,000.00 on my original Commercial Finance stock due to its increased value. All transactions pertaining to the transfers of property or other *157 assets of either the estate or the Finance Company are as of August 31, 1962. As of that date the 1135 papers for the dissolution of the Finance Company together with the transfering [sic] of the property to each of us and the closing of the estate were filed. The fact that the deeds have a later date in no way effects [sic] our respective ownership as of September 1, 1962. I am enclosing a bill of sale signed and notarized transfering [sic] my interest in 950 Broadway to you, also one transfering [sis] your interest in 1,000 Broadway to me. Will you please sign this last one and return to me. It is not necessary to have the bill of sale recorded as the filing of the deeds is all that is required. The bill of sale is proof that the sale of the property is the same value as used in the inventory. The value of the 1000 Broadway property will differ from the figure we used in the final settlement. The reason being that the 5 vacant lots were included in the inventory value. In order to eliminate paying any capital gains I deducted the value of lots bringing the actual inventory value of 1000 Broadway to the figure shown in the bill of sale. Unfortunately the statement *158 of analysis referred to in the above-quoted letter was not presented at trial or introduced in evidence. In the petition which Marian filed with the probate court she indicated her agreement and understanding and requested that the court accept Neil's account as executor. Her petition read in part as follows: I am enclosing a complete statement of the receipts and disbursements submitted to me by Neil R. Cullen, executor of the above named estate in connection with his administration thereof during the period from the 23rd day of December 1958, the date of the death of my Aunt Gertrude Cullen, to the 31st day of August 1962, without however, the usual vouchers thereto attached and shall ask you to please approve this statement as submitted. I have examined this statement very carefully and have found the same in every respect correct. The executor has paid in full the inheritance tax due the State of Colorado and the Federal estate tax. He has also paid all of the specific legacies and various property taxes. Gertrude Cullen's last will and testament shows that I am the largest residuary beneficiary and there is no one who could seriously object to accepting the statement as *159 presented; therefore I ask you to please approve the enclosed statement and accept it for the records in the estate. Neil R. Cullen, the executor and I are the only residuary legatees, divided in the following proportions: I was given three quarters of the residuary estate and Neil R. Cullen one quarter thereof. After the liquidating dividends to the minority preferred shareholders, no other substantial cash distributions were made by Commercial. However, Commercial's substantial assets were Gertrude's notes, secured by deeds of trust on 1000 Broadway and 980 Broadway, respectively. If Neil had desired that the corporation remain extant, it is clear that Commercial could have been continued in existence with Neil in control. The notes and deeds of trust would have been retained as corporate assets and Neil and Marian would have divided Gertrude's stock as their respective interests existed. However, for reasons which must have appeared good and sufficient to Neil and Marian, it was decided that Commercial would be dissolved and its assets distributed in conjunction with the settlement of Gertrude Cullen's estate. This seems to have been a logical decision since the beneficiaries *160 of both entities were fortunately the identical two persons. Neil was in charge of both matters and the interests and affairs of the corporation and the estate were inextricably combined. According to the books and records, and the evidence of record, Commercial had the following assets, which were accurately reflected on the statement of financial condition prepared by its accountants as of August 31, 1962: Cash in Banks:
First National Bank
$56,723.27
North Denver Bank 1,370.58 $ 58,093.85
Notes receivable
215,515.93
Accounts receivable
139,129.70
Furniture and fixtures 576.84
$413,316.32
Its liabilities at that time were 9,621.25
Leaving for stockholder distribution
$403,695.07
Almost all of the assets other than cash were liabilities of the Gertrude Cullen Estate. These included accounts receivable due from the estate to Commercial of $133,902.56 and $213,000 due on the 1955 notes and trust deeds, a total debt due from the estate of $346,902.56. The only substantial assets of the Gertrude Cullen Estate that remained undistributed were the Broadway properties having a value of at least $520,000. There can be no doubt that *161 the claims of Commercial against the estate were worth face value and could have been enforced. Since each interested party desired to continue to own Gertrude's 1136 Broadway property and since Neil, who had purchased Gertrude's interest in Cullen-Thompson from Marian was particularly anxious to acquire 1000 Broadway, the historic home of that business, they worked things out to their mutual satisfaction as best they could. They used and relied on the values of the estate properties as reflected in the Gertrude Cullen estate tax return and the Commercial Finance Company's accountants' final analysis and report to reach an acceptable division of the remaining assets. As mentioned in our Findings of Fact, Marian was unwilling to engage in a trade of the real estate from Gertrude's estate with Neil if the encumbrances in favor of Commercial remained outstanding. Ultimately, Marian, under the agreement reached between Neil and herself, took 950 Broadway and parcel four which were not encumbered by deeds of trust to Commercial. She assumed the $20,000 balance due on the trust deed on 950 Broadway to the First National Bank. Neil, of course, took the property located at 1000 Broadway. *162 They also agreed to continue to hold the property located at 980 Broadway as it was devised to them, three-fourths in Marian and one-fourth in Neil. The deeds of trust in favor of Commercial Finance were then released, it being certified by Neil, as president of Commercial, that the indebtedness secured thereby was fully paid. The satisfaction of these debts and release of the encumbrances, which constituted Commercial's only important assets, effectively transferred as an equitable proposition, the value remaining in the corporation to Neil and Marian. They in effect accepted the assets of the corporation and then divided them up as they wished, in light of the fact that those assets constituted encumbrances against the real property they were dividing up as the result of the administration of Gertrude's estate. In his 1962 income tax return Neil reported a long-term capital gain for the year 1962 in the amount of $72,780.25 on a "gross sales price" of $90,645.25 at the surrender in liquidation of his stock in Commercial. This gross price reported was the identical figure as that contained in Commercial's closing financial statement for the value of Neil's liquidating dividend on *163 his shares of common stock. We have found as a fact that value was transferred to him at least equal to this latter figure. We think that practically speaking, Commercial might even be said to have distributed its debts and security interests against the Broadway property to its stockholders even though in form Neil and Marian divided Gertrude's realty free and clear of encumbrances. Neil was personally administering both the estate and the affairs of Commercial, and this administration of both was, beyond doubt, in pari materia so that the result was distribution of all assets of both to Neil and Marian and a subsequent reshuffling and agreeable division between them. In any event, the notes and encumbrances on both 1000 Broadway and 980 Broadway were valid and outstanding, and after the release of the deeds of trust these properties were worth considerably more unencumbered than encumbered. Neil denies that he received anything of value at Commercial's dissolution. This denial, however, is not in accord with the facts developed at trial, and contrasts sharply with Neil's own actions in reporting the $90,645.25 on the final disposition in liquidation of his Commercial stock. We *164 are convinced that Neil's arguments to the effect that he received nothing at Commercial's dissolution were contrived only after it became apparent to him that Commercial might have been liable for unpaid personal holding company taxes. We conclude and hold that assets were effectively transferred to Neil from Commercial by the release of the notes and deeds of trust, and their fair market value, as found, was at least $90,645.25. Neil paid nothing to Commercial for this transfer and after he and Marian divided up the assets Commercial was stripped of assets, unable to pay its debts, including its liability for earlier income tax liabilities. Petitioner Neil's basic argument that he received nothing from the corporation, which had nothing to distribute, is just not supported by the evidence. Neil has maintained throughout that the 1955 Gertrude Cullen notes were worthless, invalid, shams and without substance. We have already rejected that argument and need not repeat our reasons here. The notes and deeds of trust were real, valuable and enforceable obligations of the Gertrude Cullen Estate as were the open account debit balances. In the hands of Commercial they were substantial *165 assets of the corporation and they were distributed to Neil and Marian as effectively as if their respective interests therein had been assigned upon dissolution. 1137 Respondent bore the burden of proving the transfer of assets to Neil. Section 6902 (a). As indicated above, and most particularly in our Findings of Fact, the effective transfer of these assets has been proven by respondent. The proposed transferee liability against Neil has, of course, been asserted under Code Section 6901, which provides certain procedures for assessment of such liability. Section 6901(h) defines a transferee as including "donee, heir, legatee, devisee, and distributee." Section 301.6901-1 (b) of the Regulations makes plain that this definition includes "the shareholder of a dissolved corporation." Neil does not appear to dispute that he is a transferee within the meaning of section 6901 if he received Commercial's property. He does argue halfheartedly that no transfer of assets took place while the corporation was insolvent or that such transfer did not cause insolvency. The evidence of record, however, is to the contrary. The cancellation and release of the Gertrude Cullen debts, notes and *166 deeds of trust, as part of the liquidation of Commercial Finance Company, and the division and settlement between Neil and Marian, resulted in effective transfers of assets to them without consideration; it left Commercial without property and caused insolvency or was one of a series of distributions at liquidation resulting in insolvency. See e.g., Benoit v. Commissioner, 238 F. 2d 485 (C.A. 1, 1956); Terrace Corporation, 37 B.T.A. 263 (1938); Benjamin E. May, 35 B.T.A. 84 (1936), remanded pursuant to stipulation 94 F. 2d 1017 (C.A. 5, 1938). Neil's liability as transferee under section 6901 is now governed by state law, Commissioner v. Stern, 357 U.S. 39 (1958). Lack of consideration, under Colorado law does not without more render the ordinary transaction or transfer void against creditors as a matter of law. Colorado Rev. Stat. Ann., Sec. 59-1-20. Respondent argues that in Federal tax cases transferee liability has consistently been imposed where a liquidating distribution has been made without consideration. He relies on Gaskins v. Bonfils, 79 F. 2d 352 (C.A. 10, 1935), and Arnold L. Kimmes, T.C. Memo. 1963-59, *167 as representing determinations of applicable Colorado law. Gaskins v. Bonfils, supra, however was decided before Erie v. Tompkins, 304 U.S. 64 (1938), and does not purport to find or apply Colorado law. Arnold L. Kimmes, supra, our Memorandum Opinion, involves the dissolution of a Colorado corporation, but does not at any point discuss the theory which would allow creditors to pursue a corporation's transferred assets in Colorado. No Colorado decisions are cited, and in Kimmes, this Court specifically refused to pass upon the effect of section 31-6-1, Col. Rev. Stat. Ann. (1953), which denominates corporate directors as trustees for the benefit of creditors under certain circumstances, to the extent they receive assets at dissolution. We decided there that the issue was not properly before us. In the instant case, respondent urges ultimately on brief that the "trust fund" doctrine does apply to corporate dissolutions in Colorado. Petitioners have not briefed this issue nor do they cite any helpful or applicable Colorado cases for our consideration. They are content to insist that Neil never received any assets of Commercial and that even if he did, the transfer did not *168 occur when Commercial was insolvent or did not cause insolvency. We believe that Colorado applies the general equity or trust fund rule, so that any transfer by which a corporate taxpayer distributes its assets to shareholders while insolvent, or as a result of which it becomes insolvent, is fraudulent as to respondent. The Supreme Court of Colorado has specifically approved the general "trust fund" doctrine as it imposes liability upon a director who has received assets to answer to the dissolved corporation's creditors. Crowley v. Green, 148 Colo. 142, 365 P. 2d 230 (1961). In Crowley at 147-148, 365 P. 2d at 232-233, the Colorado Court adopted as part of its opinion the following general principle found in 19 C.J.S. Corporation Sec. 1391, p. 1109: * * * where the corporation is insolvent or has reached such condition that its directors or officers see that they must deal with its assets in view of its probable suspension, they cannot use those assets to prefer themselves [* * *] in respect of a preexisting debt to the prejudice of other general creditors * * * The principle underlying the rule denying a preference is that the directors or managing *169 agents of an insolvent corporation are trustees for the creditors * * * Federal courts in deciding transferee liability cases, where no state decision or statute is directly in point and none is contrary, have not hesitated to infer appropriate and indicated equitable principles of state law in concluding that a corporation's assets and capital constitute a trust fund for the 1138 benefit of creditors. See, e.g., Neill v. Phinney, 245 F. 2d 645 (C.A. 5, 1957), applying Oklahoma law. In Neill v. Phinney, supra, it was said to be fundamental that shareholders, stripping a corporation of its assets, succeeded as transferees to its tax liability. "It is * * * by an ageless principle a liability imposed 'in equity' * * * and what is so universal in application and wise in substance ought likewise to be applied for an Oklahoma dissolution unless, by the accepted process of judicial reasoning, we are shown that Oklahoma has a different rule * * *" Neill, supra at 652. In the instant case, far from appearing that Colorado would have a different rule, it seems probable that should the specific question arise, the courts of that state would adopt the general *170 rule and apply it to a corporate dissolution case. As mentioned, the "trust fund" theory has already been adopted as to directors who prefer themselves to other creditors at dissolution. Crowley v. Green, supra.It has also been adopted where assets of an estate have been transferred to a beneficiary thereof before tax liabilities are satisfied. In such case the transferee is a trustee and liable for the taxes. Steinbaugh v. Barday, 143 Colo. 133, 352 P. 2d 276 (1960). We conclude that the usual equitable principles governing distributions which strip the transferor of assets should properly be applied here as it would be under general Colorado law. When a corporation is dissolved and its assets distributed in liquidation, the shareholders who receive the assets succeed to the tax liabilities of the corporation to the extent that they are transferees of those assets. Petitioners have not shown that Colorado has a different rule. VI. Whether assessment of liability against Neil R. Cullen as transferee of Commercial Finance Company is barred by a statutory period of limitations. Petitioner Neil has not specifically conceded this issue on brief, though *171 he presents no arguments relating to it. We conclude, entirely apart from any implied concession, that Neil's tax liability as Commercial's transferee is not barred by any statutory period of limitations. We have already decided that the determination of the primary tax liability against Commercial was not beyond the personal holding company 6-year period of limitations as to all the years after 1956, and that the 1956 deficiency was determined within the valid consensual extension agreed to by the parties for that year. Accordingly, the notice to Neil as transferee is likewise valid. It was mailed on July 30, 1964, less than "1 year after the expiration of the period of limitation for assessment against the transferor," as provided by section 6901(c) (1). There is no question but that the "period of limitation for assessment against the transferor" means the applicable statutory period (here, six years) as enlarged by any valid consensual extensions. James M. Denton, 21 T.C. 295, 301 (1953); Rite Way Products, Inc., 12 T.C. 475, 479 (1949). VII. Whether petitioners Neil R. Cullen and Marian Warfield Hefferlin are liable as transferees of the Estate of *172 Gertrude Cullen and whether the estate is subject to a negligence penalty. As mentioned in our preliminary statement with respect to Gertrude's estate, respondent has determined deficiencies in income taxes for the years 1959, 1960, and 1961 and has asserted a negligence penalty for the year 1960. The deficiencies determined amount to $12,663.91 and are unpaid. With the exception of the negligence penalty for 1960, all deficiencies are conceded to be correct. The negligence penalty of $184.03 relates to respondent's contention that sales of stock were omitted from the fiduciary return filed by the estate for 1960. No evidence whatever has been presented by petitioners with respect to this penalty assessment. Accordingly, they have failed to establish that it should not be imposed and we must uphold respondent's addition to tax under section 6653(a). As to the estate's primary tax liability, petitioners do not question that they bear the burden of proof, nor do they otherwise question that the deficiency determination was correct. Administration of the Estate of Gertrude Cullen was terminated and the assets completely distributed on or about August 31, 1962. Under Gertrude's will *173 petitioners Neil and Marian each received certain specific bequests and/or devises before taking as residuary beneficiaries on a one-fourth, three-fourths basis respectively. As reflected by our Findings of Fact, the specific gifts to each are more than sufficient to cover the Federal tax deficiencies outstanding against the estate. Marian, for example, received realty at 1200 Bannock Street in Denver which was valued on the estate tax 1139 return at $55,000. Further, she received a specific legacy of $25,000 and Gertrude's partnership interest in Cullen-Thompson valued at $89,000. Neil received a specific devise of the 350 Humboldt Street property having a fair market value of $37,500. As in Issue V, the proposed transferee liability is asserted under section 6901, Internal Revenue Code of 1954. Section 6901 (h) specifically defines transferees as including "heirs, legatee, devisee and distributee." The burden of proof is, of course, upon respondent to show the transferee liability and he has borne that burden. Petitioners clearly received tangible assets from the estate of sufficient value to meet its tax liabilities. No consideration passed for these *174 assets. The tax liabilities of the estate existed, of course, from the time the returns for the periods in issue were filed. See e.g., United States v. Gilmore, 222 F. 2d 167, 169 (C.A. 5, 1955). As is true with corporate distributions upon liquidation, distribution of a decedent's estate normally presents all of the typical requisites for transferee liability - i.e., absence of consideration, insolvency following the transfer and futility of collection efforts against the transferor. As also mentioned in connection with Issue V, transferee liability under section 6901 must ultimately rest upon state law. Commissioner v. Stern, supra.Suffice it to say that Colorado would, as in the case of liquidating corporations, invoke equitable principles so that the transferee might be pursued by the United States as a creditor even where the estate has been closed and the time for the filing of claims by creditors has expired. Such a transferee is a trustee and not entitled to estate assets until all debts for prior taxes are paid. Steinbaugh v. Barday, 143 Colo. 133, 352 P. 2d 276 (1960). The Supreme Court of Colorado stated very simply the following *175 axiom in Steinbaugh, supra at 137, 352 P. 2d at 278: In effect, until protected by the limitations on recovery set forth in 26 U.S. C.A. § 6901 supra, * * * a transferee is a trustee of the property received or might be said to have only a defeasible title to it. Petitioners' arguments as to this issue are specious. Neil and Marian urge only that the estate was not made insolvent by the transfers to them, and that in fact, it might even now be solvent. We reject these arguments as frivolous and totally unsupported by the evidence. Inherently, distributions by a decedent's estate are part of a series of transactions which look ultimately to the transfer of all the assets in the estate. Respondent relies upon our decision in Burton Ginsberg, T.C. Memo. 1965-36, which is to this effect. We reaffirm here what was said there. Contrary to the argument of petitioners Neil and Marian, it is not necessary that any particular transfer render the estate insolvent. By analogy to decisions in the corporate liquidation area cited in Issue V, we perceive sufficient insolvency if the transfer is one of a series, the ultimate design of which is *176 to distribute all the assets. Such a plan is inherent in the administration of estates generally, and where the estate has been terminated or closed as here, insolvency is a fait accompli if there are any outstanding obligations. See our opinion in Ginsberg, supra, relied upon by respondent. We believe that respondent fairly meets his burden of proof if he shows that the estate has been administered and closed, and the transferee taxpayer does not come forward with contrary facts. Mere suggestions or unsupported allegations that the estate was not then insolvent or may not even be insolvent at time of trial are not sufficient to overcome the evidence which plainly indicates otherwise. The repeated testimony at trial and other evidence of record convincingly establishes that Gertrude's estate was fully administered and formally closed as of August 31, 1962. Neil's fiduciary return for the period ended August 31, 1962, is stated to be a "Final Return." The record, to the contrary, establishes that all of the assets were in fact distributed. Respondent has borne his burden of proof to establish petitioners' liability as transferees and the amount thereof. Accordingly, *177 we conclude that Neil and Marian are liable as transferees under section 6901, I.R.C. 1954, for the deficiencies determined as to the Estate of Gertrude Cullen, Deceased, the transferor. VIII. Whether the proposed transferee liabilities for the deficiencies of the Estate of Gertrude Cullen are barred by the statutory period of limitations. The years in issue with respect to the Estate of Gertrude Cullen are 1959, 1960, and 1961. A valid consent was executed by the estate for the year 1959 which was accepted on March 14, 1963, and which extended the period for assessment to June 30, 1964. The statutory notices of transferee liability were mailed to petitioners Marian 1140 Warfield Hefferlin and Neil R. Cullen on April 6, 1965, within "1 year after the expiration of the period of limitation for assessment against the transferor," as provided by section 6901(c)(1). As mentioned in Issue VI, the period of limitations for assessment against the transferor includes, for purposes of section 6901(c)(1), valid extensions by consent of the parties. James M. Denton, supra. Therefore, the notices, mailed on April 6, 1965, were timely and valid as *178 to all years involved. To reflect any required adjustments, Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herwith: Neil R. Cullen, Transferee, Docket No. 4951-64; Marian Warfield Hefferlin, Transferee, Docket No. 3987-65; and Neil R. Cullen, Transferee, Docket No. 3988-65.↩
2. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
3. See Granite State Fire Ins. Co. v. Mitton, 98 F. Supp. 706 (D. Colo. 1951), affd. 196 F. 2d 988 (C.A. 10, 1952); Johnson v. George, 119 Colo. 594, 206 P. 2d 345 (1949); New Mexico Potash & Chemical Co. v. Oliver, 123 Colo. 268, 228 P. 2d 979, 983 (1951); Zeller v. Taylor, 95 Colo. 503, 37 P. 2d 391 (1934); and Dick v. Petersen, 90 Colo. 83, 6 P. 2d 923↩ (1931).